All right, excuse me, good to see you. The last case of the day is No. 17-30388, Davenport v. Edward D. Jones, and you're Ms. Carol? I'm Ms. Carol, yes. Christina Carol for Plaintiff Appellant Tyanne Davenport. Ms. Davenport worked at Edward Jones as a branch office administrator. She was hired there in October of 2014. She received good evaluations. She got a $400 bonus in April of 2015. She was evaluated again in October of 2015 as exceeds expectations, and she received a 4% raise then. Let me ask you something about the EEOC complaint. As I understand it, the only issue you appealed was the quid pro quo claim? Well, I appealed the entire— I mean, the only thing you argue in your brief is the quid pro quo, as I understand it. I also argued that the constructive discharge claim should not have been dismissed and that she exhausted— Well, I mean, that's not a freestanding claim. You're basing that on something else. Well, I mean, assuming that we lose the severe and pervasive and there's no hostile work environment, then it all does depend on the quid pro quo claim. That's correct. I'm looking at your EEOC complaint, and I don't see any complaint about quid pro quo. As I understand it, your quid pro quo claim is based on the fact that your client says that she was promised bonuses if she would go out with the customer's brother. Is that right? Yes, that is right. And I see nothing in the complaint about that. Well, I think that quid pro quo sexual harassment is, of course, sex discrimination. So if she checked the box for sex discrimination, it would fall within that. And I don't know that there is a separate requirement that she, as a layperson, set forth that she was subjected to quid pro quo sexual harassment. But, I mean, does that address the Court's concern? It's sort of tricky exhaustion jurisdictional points, but they are implicated in this case at least directly relates as to the constructive discharge. Right. But one line of inquiry might be that as to the quid pro quo claim, by notifying about the dating, no, about the photo, the single incident photo, how did that alert the EEOC to a quid pro quo as to dating for a bonus? Well, I think that the factual allegations are sufficiently similar. Our law is pretty tight. The similarity has got to be very similar. Well, I think that as a layperson, like I said, I don't think she's required to understand that it's quid pro quo. Let's say she is. Let's say the law isn't hospitable. It obviously isn't something that wasn't raised by the district court and hasn't been raised in this context by opposing counsel. Would that exhaustion requirement be jurisdictional so it exists or doesn't, we have to take notice? Or is that exhaustion requirement not jurisdictional, in which case they would have forfeited it if they didn't bring it up? My understanding of the current state of the law is that exhaustion is not jurisdictional. So if they didn't bring it up as to quid pro quo, as they did as to constructive discharge, it's forfeited. I think it's waivable. Yes, Your Honor. I don't have a case on that. But if you would like to answer that. No, that's sort of tricky. As you know, Brendan Coyne at some point suggested that the plaintiff date, Harry Fisher, who he viewed as a really good prospect, as a customer, so that he could have him as an investment customer and make a lot of money. She testified that he asked her five times over a 30-day period to date this man and that he at least one time told her that she would get a big bonus if she dated him. On October 27, 2015, when this man was in the office with his brother, who was a current client, Mike Fisher was a current client, Brendan Coyne said that we could break out the nudie pictures of Tyann and she also made a comment to him about moving her account, about moving the account. Now, bonus is a payment, is an employment action. But if it's a joking bonus, is that just an issue of summary judgment? Well, I think that's a question of fact about whether it's a joke or not a joke. Mr. Coyne was the one who gave her the other bonuses, correct? Bonuses were available. Was he the one that awarded her the bonuses? I don't know that that's— Or rated her? I don't think that's clear from the record. What's clear from the record is that it was based on his— it appears to me that it was based on his recommendation, that it was based on the evaluations, and that's how the bonuses were awarded. I mean, the plaintiff testified that she didn't know where the bonus was going to come from, but he said that—but the only record evidence we have— He also said the fellow has an airplane, right? He does have an airplane. Well, I'm sure that's true. But, I mean, bonus doesn't—you know, how can you infer that that had anything to do with remuneration for work as opposed to just a joke? You know, you might get a diamond ring from him if you're going steady, or you might get a ride in his plane, or who knows what. Well, I think that she was working at Edward Jones, where she had received bonuses before based on the supervisor's recommendations. But you're reading into—I mean, that's just not what she testified to. Well, what she testified to is that Brendan Coyne told her she would get a big bonus. No, she said—well— She said she wouldn't—didn't expect to lose her job if she didn't date, but she did hope for the bonus. Well, she said that he—well, she said she was never going to date this guy, but he told her that she would get a big bonus if she did date him. And then when her deposition was taken, they asked, where did it come from, what did he mean by that, and she says, I don't know. Right. She said she didn't know where the—but the only place the bonus could come from is Edward Jones. I mean, but she honestly testified that he didn't say where the bonus was going to come from. But, I mean, it's her supervisor at Edward Jones saying this to her, where she has received bonuses in the past based on his recommendation. And I have some bonus cases. There's a D.C. Circuit case from 2001, Russell v. Principe, and there are two district court cases I cited from the Northern District of Illinois and the District Court in North Carolina that all recognize— I don't think I have a problem with the idea that if somebody were being threatened or cajoled on the prospect of getting a bonus, that that might be an adverse employment action, but I just don't see the facts here. I don't see a legitimate inference here in the face of what she testified and the boorish kind of conduct that he was normally engaged in, or, well, engaged in on a few separate occasions. I just think it's a jury question about whether it was a joke or not a joke. Is that the court's concern that it was a joke about the bonus? Yes. I think that's a jury question about whether it was a joke or not a joke. I think he was pretty serious about her going out with him. I mean, he mentioned it to her over and over again and then brought the guy into the office. And then when she didn't take the bait and go out with him, he was pretty angry and was ugly to her the next day and told her that he shouldn't have given her a positive evaluation and that she shouldn't burn the place down. I mean, his attitude. Instead of a bonus, she gets a bonus. I didn't see that following from the previous day, and I think that seems a very dramatic recitation of what the record is. It's the following day. It's October 28th. I understand that, but that had to do with she had tried to document something and hadn't been able to do it, and he blew up at her, and then he said don't burn the place down. Right. So how can you say that he's still seething from what had happened the day before? Because it was the day before. So what? I mean, one day he's telling her she's going to get a bonus. But according to her, he's extremely mercurial. His own wife says he sometimes behaves like an ass. And over the course of one year, she recounts about 12 incidents. I mean, she made it clear he was a jerk. There's no doubt about that. Yes. I agree that he's a jerk, but I think that there is a definite shift in attitude from one day. He's telling her on one day that she will get a bonus and we're going to break out nudie pictures. He apologizes to her for that, and then the following day, he's telling her she deserved a negative performance evaluation. He'd never said that before. Is it undisputed that he's the one that gave ratings that led to her bonus, the $400 bonus? I believe so. I mean, he's the one who made the evaluations. He's the decision maker as to evaluations. So he has given her bonuses in the past. I think the bonuses come from Edward Jones, but I think they're based on his evaluation. I just want to mention that we also preserved the false light claim that when he says that we have nudie pictures to somebody who's a stranger to the employment relationship, that I think we meet the elements of a false light invasion of privacy claim. I mean, he has no legitimate reason for saying that, and I think it's a jury question about whether it was a joke or whether it was something that he should not have suggested. It's certainly not much different than the case I cited about where the— Do you have to show damages at some point? Well, I mean, we have emotional distress damages. I mean, we have the counselor sending them correspondence, and we have those records where she's— Okay, all right. I mean, reputational damage. Well, I don't see the reputational damage, because when you file a lawsuit in the public record, that spreads it all over. But as it was, he was saying it to one guy, and obviously male banter where everybody knows it's not true, but she did have personal injury. Yes, she suffered, yes. Thank you, Your Honor. I've ceded some of my time to you. Thank you very much. Let's see, Ms. Gantz. Yes, I'm Julie Gantz from the EEOC. We're serving as amicus in this case. What did you say about the exhaustion requirement? I was just going to tell you that. So an EEOC charge has to plead facts that would support specific themes or causes of action, but it's really—if she's talking about facts that would support a sex discrimination claim, she isn't required to say it's a quid pro quo, it's a hostile work environment. And, in fact, the Supreme Court in Farragher and Allard has said those terms are just sort of a shorthand way of saying whether there's a tangible employment action or not, and they're both ways of getting at whether the terms and conditions of employment have been violated. But she didn't mention the promise of bonuses. She didn't mention it in her charge. It's mentioned in the complaint. No, no, I'm talking about the charge now. The charge is really to give notice to the employer and to the commission to be able to investigate. So it's not required to detail every incident of what happened. And to answer your question, Judge Higginson, the Supreme Court held a— Well, maybe stick with that. I'm curious, but stick with that line of inquiry because the Fifth Circuit has been pretty exacting on that it be sane. You've got a case. Do you have any case from our court that says hostile work environment is enough notice for quid pro quo? It doesn't say hostile work environment either. Or the nude photo as a distressing moment, sex discrimination equaling a quid pro quo. What would be your— Well, it's a sex discrimination case, and there are different ways of getting— What's your best case from our circuit that that's sufficient? I didn't brief that, so I'm not sure. But, again, your question about whether it's waived was set a long time ago in Zipes. I don't have a Fifth Circuit case that says that, but it's— So assuming then it's not, still where does that get us? Assuming that it's not— Assuming there's a disconnect and, therefore, there's an exhaustion problem. There's no exhaustion problem. Let's assume there were. Okay. Would that be of jurisdictional consequence or not? It's not of jurisdictional consequence. And the key question is whether there was a tangible employment action here. When you say it's not jurisdictional, what's your best authority for that? Zipes versus Transworld Airlines, which was decided in the early 80s. It was settled a long time ago. So back to the—can I turn, since I don't have very much time, to the bonus issue? So Brendan Coyne signed her bonus worksheet when she received the one bonus she received, which was in April 2015. I have the form and the record. He signed it. So it was clear that he was the one awarding the bonus. Then he started asking her to date Fisher. It should be around October. Six months later. Right. So she gets her year evaluation, and she gets a 4% raise, but she does not receive a bonus. And this coincides with the same timing that he is asking her to date Fisher. Then on the 27th is the nudie pictures comment where he says, oh, she'll break out the nudie pictures. So this all was going on, and he had told her at least once, you'll get big bonuses if you date Fisher. And the fact that he mentioned he had an airplane and that he was rich, a jury could just as easily find he was motivated by his own financial gain in this. As you can see from the facts that we put in our statement of facts, he had very low disregard for this employee. He called her an F-up. He called her incompetent. He yelled at her once a week. There was no ‑‑ it would be very hard for a jury to find on this record that he was just kidding around or that he had any kind of goodwill for her. Even if he is, it's a jury question.  Well, how do you ‑‑ I mean, you know, just because it's a 6 foot 7 inch guy saying that to a woman, you can't just say that boorish conduct is sexual discrimination. No, the sexual discrimination comes into play when a benefit, like a bonus, big bonuses, which is a significant change in employment status, is conditioned on her dating this person. Well, I'm telling you, I can see circumstances where that might be the case, but if you don't have something that says that, you know, normally they're extraordinarily discretionary in most workplaces. Well, they have an official worksheet here that's separate from their salary increase sheet. Like a tangible employment action, it's an official action. It can only be done by a supervisor. Of course, because the company has to cut the check. But what I'm saying is that the fact that a person could theoretically give a bonus and then in this particular context is telling her, oh, well, when she knows she has a boyfriend, I mean, I just ‑‑ it's hard for me to take it seriously. Well, a jury could take it seriously, given that he gave her a bonus in April of 2015 and she did promise her that she would receive big bonuses if she dated Fisher, asked her repeatedly to go out with Fisher, and then when she has her year review in October 1st, right around the time that he's asking her to date Fisher, there's no ‑‑ She got a bonus. No, she did not get a bonus. She got a 4%, right? That's not the same. They use different forms. It's not a bonus. And even if she did get the raise, it doesn't take away from the fact that she didn't receive the big bonuses that he promised. So a jury, based on that input ‑‑ Well, she went right after that, so there was, you know, I guess ‑‑ Well, she said over a 30‑day period, he asked her less than five, more than three times to date Fisher, and her last day in the office was October 28th, and the day before was when he mentioned the nudie pictures, that she'll break out the nudie pictures. So if you go back 30 days, that's the end of September. That's right around when she was having her one‑year anniversary and her review on October 1st. She also, if you look at her medical records, says the onset of her stress‑related medical problems began October 1st. But you're ignoring our red light. Oh, sorry. Okay, so we urge you to reach the legal questions we briefed them. Thank you. Yes. I gave you a couple extra minutes. Ms. Doucette. Your Honor, I'd like to address three points in response to Appellant's argument. The first is with respect to the invasion of privacy false light claim. The second is with respect to the Title VII quid pro quo claim. And the third is with respect to the constructive discharge and the exhaustion of the constructive discharge claim. Now, with respect to the invasion of privacy. The preliminary questions we've been asking opposing counsel, do you have an asserted exhaustion as to the quid pro quo claim? We did not assert that. The appellee did not assert that. What we asserted was that the appellant did not exhaust her constructive discharge claim. And you have not asserted the other? We have not. Is that a jurisdictional issue? It is absolutely a jurisdictional issue. This court held in the Sanchez case, and that is Sanchez versus the General Growth Management Company from 1998. This court said that it was a jurisdictional issue in 1998. And then again in Pancheco versus Mineta. What do you have to do to exhaust, say, a quid pro quo claim? To exhaust a quid pro quo claim, because a quid pro quo claim is a Title VII sex discrimination claim. I mean, it falls under the ambit of Title VII. And so clearly you have to check the box that says sex, which the appellant did. But you also have to raise facts in the EEOC charge that would raise at least for the EEOC to investigate those facts. So that the EEOC would be able, or anyone else, this court, would conclude that the facts surrounding the quid pro quo claim could be expected, reasonably expected, to come from the allegations in the particulars portion of the EEOC charge. Why didn't? So you thought they sufficiently did that? No, I do not. I think she raised a Title VII sex discrimination and sexual harassment claim, and the issue came up before the district judge in terms of whether or not this was a quid pro quo and a hostile work environment claim. Now, in the charge, she does say that her former supervisor mentioned the nudity pictures, the purported nudity pictures, and did so in order to try and get some business. Now, in the EEOC charge, there is no mention of the bonus. So it's a tough one. But you didn't press it below or here. We did not. We did not. What we pressed was what we thought was a sure bet, which is the constructive discharge. But it is important for the facts to be spread out to the EEOC so that it can investigate, and the point of investigating is to conciliate. And if the plaintiff hasn't referred the EEOC to what now seems to be such a focal point, then the whole point of administrative exhaustion is failing. I agree. I agree. I'm sure you do. I absolutely agree. But I will submit to the court that that's a tough question. And it is— Why don't you get on to the material parts of your argument? Of course. Of course. We know what it is. Of course. So with respect to the invasion of privacy claim, what the appellant alleged was that her former supervisor made a comment in front of a client about her showing nude pictures of herself.  Now, opposing counsel just said that the issue of whether or not that comment about the nude pictures was a joke should go before a jury. I submit to you that should not go to the jury. And if I may, I will reference the record, because in the record, page 235, what the appellant said was, in my opinion, he was trying to be funny. But he wasn't funny. He looked like a fool. So that's her sworn testimony. So it is certainly—and we took that testimony, her own words, and that's what we advanced in our motion for summary judgment, Your Honor. So this is not an issue to go before the jury. We assumed that what she said on page 112 of her deposition was true, that her former supervisor was attempting to be funny when he was talking about these supposed nudie pictures. I also will reference this Court to page 240 of the record, where the appellant adamantly said, there are no nude pictures of me. I would never take a nude picture. So there—she says—she suggests by way—and she suggested several times during her deposition testimony, no one believed for a second that there were any nude pictures of me out there. You maintained her dignity. She quit not severe enough. That's essentially saying there were no nude photos. It was a statement that was a joking statement. She quits. She's maintained her dignity. It isn't an invasion of her privacy. Well, it is—yes. It isn't—assuming everything she said was true, the district court found that this wasn't an invasion of privacy, that there was no objective possibility here that the joke, the bad joke put her in a bad light or put her in a false light or revealed any embarrassing facts about her. And so because of that, we're asking this Court to affirm the district court's summary judgment. This is not appropriate for a jury. There is no fact issue here. The district court's decision on that should be affirmed. Going to my second point about the Title VII quid pro quo. The district court applied a correct definition and interpretation of Title VII quid pro quo when looking at the appellant's claim, and that definition was that quid pro quo sexual harassment is when there is a tangible employment action resulting from an employee either accepting or rejecting sexual advances, either the rejection or the acceptance of sexual advances from a supervisor. When that results in a tangible employment action, that is when you have quid pro quo under Title VII. You intonate with emphasis from a supervisor. Are you embracing the district court's logic that you can't have a pay for sex when it's to a customer instead of to the supervisor? I am embracing the district court's language because verbatim Judge Feldman cited to what Alanis and all the other courts in this circuit say when they define quid pro quo harassment, which is it refers to sexual advances by a supervisor. And the language by a supervisor is important, Your Honor, because quid pro quo harassment results in employer liability and vicarious liability by the employer. So the reason why that language is there, the by a supervisor, is because the harassment has to be by someone who has the authority to impose a tangible employment action on the employee. Now, the cases cited to in the appellant's brief and in the EEOC briefing where they basically, there are arguments that quid pro quo harassment should cover sexual advances by a client. Those cases are markedly different. Well, sexual advances by the employer to get a prospective client. Well, okay, so let me step back. If that's the situation that you're dealing with, sexual advances. Isn't that the Rodriguez First Circuit case? No. What happens in Rodriguez, Your Honor, is that the client made the sexual advances. The client made overt sexual advances against the employee, invited her to a hotel room. Right. What happened was then that the supervisor ratified those sexual advances by telling the employee that she needed to do it and then firing her when she didn't. How is that distinguishable? Distinguishable from this case? Where the supervisor on his own initiative says, I want that client, date him. How is that at all different than the client initiating it and then the supervisor ratifying it? Well, it's distinguishable completely from this case because in this case, her supervisor did not say, I want that client dated. What we have is a supervisor who said to her, you should date that guy. He's got a whole lot of money in an airplane. And, again, when we're talking about quid pro quo harassment, the important so let's stop there. Because Judge Feldman noted that in this case there were no sexual advances. There were no sexual advances by the supervisor. There were no sexual advances by the client. So that's the first no-no. The second issue was the first no-no. Go out with him and then we have nudie photos of her also? You're saying that's just friendly platonic go out with? That's not implying sex? No, not in this case. The nudie photos, again, referencing because I think these record sites are incredibly important to put this into the proper context. The nudie picture with the appellant admitted is that the nudie picture remark was an ill-fated attempt by her former supervisor to be funny. In fact, you know, that's the only thing she put in the EEOC charge. She didn't even put the dating comments in the EEOC charge. At the very least indicates what she thought was most likely to be significant. Agreed. Agreed. But going back to what you were asking about, Judge Higginson, so there were no sexual advances, not from the client and not from the supervisor. More importantly, there was no tangible employment action. Yeah, that's to me the harder issue, but go ahead. So going back to – taking it full circle and going back to your question where you said how is a situation where you have an employer who says, I want that client, go date that client, is that quid pro quo harassment? Well, it isn't if it stops there because if there's no tangible employment action, if there is – And he says big bonus. If he said – In your brief, that's at page 22, and you say that's not actual, that's impression. And you drop a footnote which doesn't have a case site. It says id, but the prior one is a record. What's the case that draws that distinction? That if an employer says big bonus if you do the following, that that wouldn't be a jury question as to whether that's actual big bonus or we should all know as a matter of fact no reasonable juror could conclude that it was an impression of a bonus. That's the distinction you're asking us to draw? That's one of the distinctions. What's the law that supports that if your record site didn't exist? I can – I don't have in front of me the record site, Judge Higginson, and I can certainly supplement and make sure that you do have that. Do you remember the statement in your brief? I do. I do. It's difficult when you drop a footnote to a case but the record site is to the record. So what's the case that stands for an impression of a bonus as a matter of law cannot be a tangible employment action, but an actual bonus is? I do not remember that case in terms of an impression of a bonus off the top of my head, but I will point if I may, Your Honor, just because I do want to talk about this bonus because it goes into what you're asking about in terms of an impression, a real versus theoretical bonus, so to speak. And again, let's go to the record because if you look at the record on page 231, because I pressed the appellant about this at her deposition, and I said what is this bonus that you're talking about? What is the source of the bonus? Who is the bonus going to come from? And her response to that was I don't know. I don't know. I don't know what my supervisor was thinking. It didn't matter to me. So in terms of me trying to get some clarity and some specifics in terms of this big bonus that she was talking about, in light of the fact that Edward Jones does not offer any bonuses based on client satisfaction or making a client happy. There is no evidence in the record in terms of those types of bonuses even existing. But she got a 400 exceeds expectation. I assume that she's polite to people that come in the door. It's just your overall conduct. The $400 bonus that she received in April of 2015, that was a bonus that she received, you're right, in context with performance and receiving a high performance rating and also getting over as a trainee the milestones that were set for her in writing in terms of her being a B.O.A. trainee. It was a B.O.A. trainee bonus. She got over the milestones in terms of meeting those bonuses, and correct. It was absolutely a performance-based bonus. However, to the extent that she's referring to a big bonus in order to go out with a client, there is no such bonus that exists at Edward Jones. There is no evidence in the record that speaks to a client satisfaction bonus. And so when I asked her, what are we talking about here in terms of specifics as to, A, the source of this bonus? Does the bonus come from your supervisor? Does it come from his pocket? Does it come from Edward Jones? Does it come directly from the client? I didn't mean to interrupt you. Cohen, the evaluator, he was the man who was responsible for making the recommendation. Correct. Yes. If he promised her a bonus, he could make the recommendation based on good performance or any other vague thing, couldn't he? He could. He could. He was the person, Judge Davis, who was responsible for giving a bonus. I also want, because we're talking about the bonus now, I want to take the bonus into context under Fifth Circuit law, because that's important as well, because what Fifth Circuit law says is that an offer of a bonus or a denial of a bonus, as the law stands right now, is not a tangible employment action. So what we're talking about here and debating is something that doesn't even rise to the level of a tangible employment action under Fifth Circuit law. What Fifth Circuit law says is that in order to have a tangible employment action and advance your quid pro quo claim, you have to have some action that represents a significant change in your employment status or a decision that results in a significant change in your employment benefits. A bonus — Those cases are in the brief. Those cases. It's hard for me to understand how a bonus isn't a benefit, isn't a salary. A bonus is not under the — we cite to many cases, Your Honor, including Watts v. Kroger for Fifth Circuit from — They're in your brief. We'll look at them. We cite many, many, many cases from this circuit where the court says not specifically discussing a bonus but discussing several other components. I'm expecting a specific case about a bonus. If you say our law — They only cite three cases for bonuses in the entire history of Title VII. So to expect a specific Fifth Circuit case on a bonus is a little — Well, I'm asking her because she said there's a Fifth Circuit case that says bonus isn't. But now if it's not that it was a case on bonuses because there are none, that's different than what you just told me. Well, then let me correct that because what I meant to say, Your Honor, is that there are Fifth Circuit cases that speak to the actual standard, which is in order to have a tangible employment action, that it has to be a decision that results in a change in employment benefits. For instance, a letter in the employee's file is not a tangible employment action. Correct. Correct. But there is — If he'd said directly, have sex with me or else the bonus you got last time you won't get again. No Title VII case? Not under Fifth Circuit law right now, no. OK. More, in my mind, realistically. Could you ask — could you discuss the Second Circuit gin decision? It goes back to our earlier discussion about is it really the fact that it couldn't be a tangible employment action if the bonus for sex isn't written into a policy? Do you remember that case? Yes. The Second Circuit said that can't be it, that we can't say these aren't real employment actions because they aren't in policy. What company would ever write into their policy you can get a bonus if you have sex with customers? Yeah. I'm not familiar with the — Gin decision? OK. Well, then go ahead with your argument. The gin decision, Your Honor. But following from that, I will say, you know, what the Fifth Circuit says right now is that in order to have a tangible employment action, there has to be a decision that results in a significant change in employee — in employment benefits. That suggests — and the case law that adopts that reasoning suggests that in order to have a tangible employment action, there needs to be a change in what you already have. You don't already have a bonus. And so right now, in accordance with Fifth Circuit law, a change in your work schedule, such as in the Williams case, if someone is assigned to a different part of a restaurant, which then results in them getting lower tips, a situation where you ask for a change in your job duties, or in the Sanders v. Casa View case, which is a 1998 case from here, where the — Williams is a great example. Wash the walls. Get the less good tables. Those are exactly what the waitresses were already doing. That's right. It's not you'll get less money. Well, theoretically, the waitresses — I'm sorry. I didn't mean to — No, that's the practicality of being in that line of business. But it's interesting, Judge Higginson, because what the waitresses said in Williams was that by way of moving us to the less desirable section of the restaurant, you're putting us somewhere where the tips are going to be worse and we're going to get less money. That's not money that already was in their pocket. It was money that was theoretical, kind of like the theoretical bonus that Ms. Davenport is talking about now. So, yes, I agree with you. Williams is a great case for me, and it's a case that was decided for by this circuit. Your Honor, if I may, I'm out of time. May I quickly just close? What was your third point? My third point, Your Honor, was with respect to the constructive discharge claim, because we talked about that briefly before, and the fact that the appellant has not exhausted her constructive discharge claim. The district court correctly noted that it did not have subject matter jurisdiction based on that. The EEOC charge was filed in November of 2015. The appellant resigned from Edward Jones in January. She did not amend her charge. She did not file another one in order to properly exhaust her administrative remedies with respect to constructive discharge. The charge is there. The charge is gone. It was correct. You've got your argument on that in your brief. Thank you. Okay. Thank you very much. Ms. Carroll. Your Honor, with regard to the bonus issue, I just want to point out that in Edward Jones' own anti-retaliation policy, they mention bonuses as a part of compensation, and that's at page 286 of the record. I also wanted to note that I had a copy of Pacheco v. Mineta, and in footnote 7, they say there is disagreement in the circuit on whether a Title VII prerequisite such as exhaustion is merely a prerequisite to suit, and thus subject to waiver and estoppel, or whether it is a requirement that implicates subject matter jurisdiction. And so they're citing to Zipes v. Transworld, where the Supreme Court has said that filing EEOC filing deadlines are not jurisdictional. Pacheco is a 2006 case. That is not the same thing as the specificity of the complaint. Well, in Pacheco. I mean, you know, I give Ms. Doucette a great deal of credit for saying that it's a closed question, but the whole point of the EEOC conciliation process is so that they can come to the employer and they can work something out short of the courthouse. The charge is not like a complaint in federal court where you can even post Iqbal, you can get away with a lot of vagueness. It's got to tell them what the complaint is. And since we're entirely focused on bonus now, it seems to me that proves it was significant omission. That's just my view. My memory is that the EEOC file included the entire investigation with Susan Miller, and so that as I don't know that it's in the record, but as a matter of fact, the EEOC did investigate all of her complaints because she forwarded those to Susan Miller and they were investigated by the company. Well, you were in the middle of giving some law, discussing law on that point. Well, what Zipes v. Transworld says is that EEO filing deadlines are not jurisdictional, but what the Fifth Circuit said in Pacheco is that there is a split, there is a disagreement in this circuit on whether it's a prerequisite to suit and subject to waiver and estoppel or whether it's jurisdictional. So this is a 2006 case, which is not so recent, and so I would just like the opportunity to give the court, I don't know the up-to-date law on that, about whether or not that's still the state of the law or whether it's changed. It may not be up-to-date. It may be a matter of going back to find out which controls. But go on. You have very little time. And the other thing about the administrative charge is that the focus is on the EEOC investigation, which can reasonably be expected to grow out of the charge of discrimination. I note that in her complaint, she says that the customer came in. He talked about having nudie pictures of Tyann. It was tied to the account. And that she says that she was retaliated against for being sexually harassed. And quid pro quo claims are not a lot different than being retaliated against for not acceding to sexual demands, because you're retaliated against by not receiving benefits or by being told you're incompetent and your evaluations were poor and you shouldn't burn the place down. What about her strong statements that our law says it's got to be by the supervisor? I think that saying that the sexual favors have to be requested by the supervisor fails to appreciate that the supervisor can require that the sexual favor be with somebody else. The important thing is that the supervisor requests it. It doesn't matter who the sexual favor is with. Judge Feldman noticed this too. She did not know what COIN meant by a bonus for dating Mr. Fisher, whether it would be from COIN, Edward Jones, or from Mr. Fisher. My impression from her deposition testimony was whether or not he had told her where it would come from. I could be wrong about that. And that she was just trying to testify honestly that she didn't know where the bonus would come from, but that he told her she would get a big bonus. But the only other evidence of bonuses in this case are bonuses from Edward Jones. And I think that otherwise you just talk about money from the rich guy with the airplane, and I don't know why you would characterize that as a bonus if it's going to be from her boyfriend. You don't usually call bonuses something that you get from your boyfriend. You get bonuses at work, and you get bonuses from your employer. A lot of this language is colloquial and obviously doesn't mean his use of bad language, his use of the phrase about nude photos and so on is just hyperbolic. I mean we're getting to a point where anything can be condemned in certain ways, and should it all be judicialized? It's a jury question. Touche. Thank you. Thank you. We'll be in recess.